DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**J.A.R.,** a child,
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2022-2469

[November 8, 2023]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Lisa S. Small, Judge; L.T. Case No. 502021CJ001093AMB.

Carey Haughwout, Public Defender, and Nancy Jack, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Sorraya M. Solages-Jones, Assistant Attorney General, West Palm Beach, for appellee.

LEVINE, J.

Appellant appeals the order which withheld an adjudication of delinquency for unlicensed carrying of a concealed firearm and possession of a firearm by a minor. Appellant argues that the trial court erred when it admitted an expert's testimony regarding "ShotSpotter" technology, which can detect the sound of gunfire and notify police. Appellant claims the state failed to present substantial competent evidence that the expert's scientific testimony was reliable. We find that the trial court did not err in admitting the testimony under *Daubert* and section 90.702. As to the other issues raised by appellant, we affirm without further comment.

On September 14, 2021, at 12:43 a.m., a gunshot detection system known as ShotSpotter alerted to a shot fired at an address in Riviera Beach. Using real time surveillance cameras, an officer observed two males—one of whom was appellant—walking from the immediate area of the alert. No other individuals were in the area. Another officer immediately responded to the scene and made contact with the two individuals. The officer observed bulges in appellant's pockets, which he believed to be a firearm. The officer asked the individuals if they heard

any gunshots, and appellant stated he did. The officer asked if he could check them for weapons, and they both agreed. The officer found a firearm and magazine inside appellant's pockets.

Appellant was charged with unlicensed carrying of a concealed firearm and possession of a firearm by a minor. The ShotSpotter evidence was used at trial, in part to explain why police responded to the location and why they made contact with appellant.

Before the bench trial, appellant moved to exclude expert testimony regarding ShotSpotter technology as it relates to detecting gunfire, arguing the testimony was inadmissible under section 90.702 and *Daubert*. The state responded that the testimony satisfied section 90.702 and *Daubert*.

During a hearing on the motion to exclude, the court heard testimony from the expert, Collier, a forensic services manager at ShotSpotter, Inc., with seven years of experience. Collier had previously testified over 70 times about the ShotSpotter system and had been qualified as an expert on most occasions. He explained that ShotSpotter is an acoustic gunshot detection and location system, which uses GPS enabled microphones and sensors to geolocate detected gunfire. The ShotSpotter system has three components: sensors, a location server, and an application. The sensors receive impulse data, which they pass to the location server, which in turn processes that data to determine the location. That information is then passed on to a person who reviews the system's findings and provides a classification. At that point, the information is published to an application that runs on an iPad, iPhone, office computer, or mobile data computer.

Collier stated that ShotSpotter technology is primarily based on two techniques. The first technique is the "time difference of arrival," which measures the time difference that an "impulsive sound" arrives at one or more sensors. Time difference of arrival is a concept that when sensors are pinged or capture an impulsive sound, there are different distances from that impulse. The process of determining where that sound occurred is measuring that time difference of arrival. The difference in time of arrival at two points can be plotted onto a map or graph paper.

The second technique is "multilateration," which makes use of the time difference of arrival at three or more listening locations to determine where the sound originated. It can be illustrated by hyperbolic curves between the locations that eventually intersect. Multilateration is used in avionics to determine the location of aircrafts and airports. Its early uses date back to World War I, when multilateration was used to determine where to return artillery fire.

2

Collier testified that ShotSpotter is able to accurately determine the location of gunfire within a 25-meter radius, which is the length of a basketball court. An independent audit, using data from 2019 and 2020, confirmed ShotSpotter had an accuracy rate of 97%, with an error rate of .41%, which ShotSpotter rounded up to .5%.

Collier testified in more detail as to each of the components of the ShotSpotter system. A program manager and project team determine the optimum placement and number of sensors to be installed. A sensor has the following primary components: a microphone, a CPU that processes data and stores audio information, a GPS receiver to know where the sensor is located and to receive time synchronization, and a means of connecting to the internet via a cellular radio.

The sensors listen for impulsive sounds, such as a clap, a dog barking, or jackhammers. If at least three sensors capture a series of impulsive sounds, the information is passed on to the location server. The location server runs algorithms that include techniques like multilateration to determine whether the sound is likely gunfire and whether the location can be determined with a high degree of confidence. If the answers to these inquiries are yes, the location and audio clips are passed on to a reviewer who determines whether the sound is gunfire.

Collier noted that ShotSpotter has two incident review centers. Each review is performed within 60 seconds of receipt. The employees who review the impulsive sounds are trained to determine whether the audio is gunfire. They consider how far the sound traveled and listen for context clues, such as tires screeching. If the reviewer believes there is gunfire, then the information is published. A published incident goes to user interface, like an iPhone or iPad, where the user receives an alert to view the incident on the map and play the audio.

Clocks on the sensors are synchronized through GPS receivers to satellite time that is accurate to the millisecond. The system is regularly checked on three levels to confirm it is working. First, each sensor sends a signal every minute or so to the location server to confirm it is operating. Second, third party applications that run on the system check to see if a sensor is available. Third, the customer support team routinely confirms the sensors are operating.

Collier testified that the ShotSpotter system is installed in over 100 cities and has been around over 20 years. He further stated that the company does not release to the public the location of the sensors or what

the sensors look like for safety reasons, because some are installed on private residences, and to prevent intentional destruction or damage of the devices. The two techniques ShotSpotter relies on—multilateration and time difference of arrival—have been tested and peer reviewed and are generally accepted in the scientific community.

Collier performed a post-analysis review to confirm the time, location, and account of this shooting incident and documented his findings in a detailed forensic report. Collier testified in detail regarding his forensic report, which was introduced into evidence. Four sensors were used to identify a single gunshot fired at 12:43 a.m. on September 14, 2021, at an address in Riviera Beach. Although only three sensors were needed, the fourth sensor confirmed the findings of the other three. The multilateration process was used to determine the coordinates and to provide the address to the police.

The trial court denied the motion to exclude, finding that Collier qualified as an expert in ShotSpotter technology. The trial court further found his expert opinion was admissible under *Daubert's* three prongs. First, Collier's testimony was based on sufficient facts and data. Collier went through his report in detail, explaining the facts and data upon which he relied. Second, ShotSpotter's technology was based upon tested and accepted principles in the scientific community, that being multilateration and time difference of arrival. The trial court further found that the technology had been tested by a third party, albeit commissioned by ShotSpotter.[1] ShotSpotter had its own internal checks, such as three levels of ensuring the sensors are working. Third, Collier applied the principles and methods reliably to the facts of the case. He explained what data he used and how he applied the multilateration and time difference of arrival principles. Based on these findings, the trial court overruled appellant's *Daubert* challenge.

After a bench trial, the trial court withheld adjudication of delinquency for unlicensed carrying of a concealed firearm and possession of a firearm by a minor. This appeal follows.

Appellant argues that the trial court erred in admitting the expert testimony about the ShotSpotter technology alert for gunfire, claiming that the expert's testimony failed to show the technology was scientifically reliable. Further, appellant claims that the trial court failed to perform its

---

[1] The trial court noted the error rate was determined to be .15%, but Collier actually testified to an error rate of .5%, which he explained was rounded up from .41%.

gatekeeping function under *Daubert*. The state, in turn, argues that the trial court did not abuse its discretion in admitting the expert testimony of the ShotSpotter technology and that the expert's testimony satisfied *Daubert* and section 90.702.

A trial court's ruling on the admissibility of expert testimony under section 90.702, Florida Statutes (2021), is reviewed under the abuse of discretion standard. *Kemp v. State*, 280 So. 3d 81, 88 (Fla. 4th DCA 2019).

Section 90.702 codifies the *Daubert* standard as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

A trial judge, under *Daubert*, has a gatekeeping role in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). When exercising the gatekeeping function, the trial judge makes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

Some of the relevant factors to be considered when determining the reliability of expert testimony include the following: (1) whether the theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation, and (4) the general acceptance in the scientific community. *Id.* at 593-94. However, it is also important to note the test of reliability is flexible, and the list of *Daubert* factors do not apply to all experts or in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

We find that the trial court did not abuse its discretion in admitting Collier's testimony regarding the ShotSpotter technology. Collier had seven years' experience working at ShotSpotter, including working as a forensic services manager performing forensic reviews of the technology's data and documents. Further, Collier had previously testified over 70 times about the ShotSpotter system and had been qualified as an expert on most occasions. Based on all this background, Collier had been "qualified as an expert by knowledge, skill, experience, training, or education." § 90.702, Fla. Stat. (2021).

We also find that Collier's testimony satisfied all three prongs of *Daubert*. First, Collier's testimony was based upon more than sufficient facts or data. The testimony included details about the ShotSpotter system's sensors, location server, and application. Collier testified how the location of the gunfire was determined by multilateration, which makes use of the time difference of arrival, at three or more listening locations, to determine where the sound originated. Finally, Collier, in the hearing, went step-by-step over his detailed forensic report.

Second, Collier's testimony was the product of reliable principles and methods. Collier testified that the ShotSpotter technology is based on two different techniques: multilateration and time difference of arrival. He explained how these techniques worked to locate a sound. Collier testified that these techniques have been used since World War I and are still used in avionics. Specifically, the ShotSpotter system has been installed in over 100 cities and has been in existence for around 20 years. Collier stated that ShotSpotter is able to accurately determine the location of gunfire within a 25-meter radius. An external audit confirmed that this system had an error rate of less than half a percent. Finally, ShotSpotter has three levels of internal checks to ensure sensors are working.

Third, Collier applied the principles and methods reliably to the facts of this case. Collier explained the data he used and how he applied the multilateration and time difference of arrival principles. In this case, four sensors were used, even though multilateration requires only three sensors, and the fourth sensor confirmed the findings of the other required three sensors.

Appellant argues that the prongs of *Daubert* were not met. We disagree. Trial judges "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Carmichael*, 526 U.S. at 152. All of appellant's arguments go to the weight of the evidence, rather than to its admissibility. Appellant objects, for

6

example, to Collier's testimony because he is not an engineer. However, an "expert is not required to have an in-depth knowledge of all the algorithms underlying their technological tools—such as hardware and software—to reliably testify about the outputs of those tools." *Walker v. State*, 308 So. 3d 193, 198 (Fla. 4th DCA 2020) (citation and internal quotation marks omitted). Thus, Collier could testify to the "outputs" of the tools, that being the determination of the location of gunfire.

Finally, we also note that other jurisdictions have determined that ShotSpotter technology is reliable and consequently have denied pretrial motions in limine. *See State v. Hill*, 851 N.W.2d 670, 689-91 (Neb. 2014) (rejecting argument that ShotSpotter technology was not reliable under *Daubert* and affirming denial of pretrial motion in limine); *People v. Brewer*, F082631, 2023 WL 3447037, at *12-13 (Cal. Ct. App. May 15, 2023), *review granted* (July 26, 2023) (holding the same); *see also* Leila Lawlor, *Hardware, Heartware, or Nightmare: Smart-City Technology and the Concomitant Erosion of Privacy*, 3 J. Comp. Urb. L. & Pol'y 207, 220 (2019) ("ShotSpotter recordings and reports are regularly admitted into evidence.").

In summary, we find that the trial court did not err or abuse its discretion in admitting the testimony regarding the ShotSpotter technology and determining that it met the *Daubert* test. As such, we affirm.

*Affirmed.*

GERBER and CONNER, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

7